**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**JOHN L. SKAGGS,**

      **Plaintiff,**

              **v.**

**MICHAEL J. ASTRUE,
COMMISSIONER
OF SOCIAL SECURITY,**

      **Defendant.**

                       **Civil Action 2:12-cv-47**
                       **Judge Edmund A. Sargus**
                       **Magistrate Judge Elizabeth P. Deavers**

<u>**REPORT AND RECOMMENDATION**</u>

Plaintiff, John L. Skaggs, brings this action pursuant to 42 U.S.C. §§ 405(g) and

1383(c)(3) for review of a final decision of the Commissioner of Social Security

("Commissioner") denying his applications for social security disability insurance benefits and

supplemental security income.  This matter is before the United States Magistrate Judge for a

Report and Recommendation on Plaintiff's Statement of Errors,  the Commissioner's

Memorandum in Opposition, and the administrative record.  (ECF Nos. 11, 16 and 10.)  For the

reasons that follow, it is **RECOMMENDED** that the Court **REVERSE** the Commissioner's

finding of nondisability and **REMAND** this case to the Commissioner and the Administrative

Law Judge ("ALJ") under Sentence Four of § 405(g).

## I.      BACKGROUND

Plaintiff protectively filed an application for disability benefits on August 28, 2008, in

which he alleged that he has been disabled since June 17, 2007, at age 47.  (Record at 122-26,

127-31.)  Plaintiff alleges disability as a result of back and neck injuries, numbness in his legs

and hands, an injury to his pinky finger on his right hand, a plastic lens in his right eye, and

depression.  (R. at 147.)  Plaintiff's application was denied initially and upon reconsideration.

Plaintiff sought a *de novo* hearing before an ALJ.

ALJ Timothy G. Keller held a hearing on March 15, 2011, at which Plaintiff, represented

by counsel, appeared and testified.  (R. at 42-53.)  Richard P. Oestreich, Ph.D., a vocational

expert, also appeared and testified at the hearing.  (R. at 53-55.)  On April 13, 2011, the ALJ

issued a decision finding that Plaintiff was not disabled within the meaning of the Social

Security Act.  (R. at 19-32.)  On November 23, 2011, the Appeals Council denied Plaintiff's

request for review and adopted the ALJ's decision as the Commissioner's final decision.  (R. at

1-4.)  Plaintiff timely appealed.

## II.   HEARING TESTIMONY

### A.      Plaintiff's Testimony

Plaintiff testified at the hearing that he is unable to work due to pain in his neck and

shoulders, as well as numbness in his hands and arms.  (R. at 46.)  He described the pain in his

neck and shoulders as having greater effect on the right side, and stated that it feels "[l]ike a

dagger [is] stuck" in his back.  *Id.*  Plaintiff further testified that he experiences difficulty sitting

and standing, and that he feels pain "pretty much everywhere."  (R. at 49.)  He is not able to lift a

gallon of milk.  *Id.*  He estimated that the heaviest object he could lift would be a cup of coffee.

(R. at 50.)  Plaintiff cannot reach overhead due to pain in his shoulders and neck.  (R. at 50.)

Plaintiff further testified that his pain never goes below a 6 or 7 on a scale of 1 to 10, with 10

being the highest.  (R. at 53.)  At times his pain reaches an 11-12 on a ten-point scale.  (R. at 52.)

Plaintiff also testified that he suffers impairments in his right eye, as well as from blood clots and

depression.  (R. at 42.)

Plaintiff testified that his wife completes all housework and grocery shopping. (R. at 49-50.) Plaintiff is unable to do chores and spends most of the day in his bedroom alone watching television. (R. at 48.)

Plaintiff has undergone numerous medical treatments, including physical therapy, injections, spinal cord stimulator, radio frequency ablation, and medication. (R. at 47.) According to Plaintiff, none of these treatment methods or combination of treatment methods provided relief. *Id.* Plaintiff testified that he dislikes taking medication because he gags on his pills. (R. at 48.) He also requires reminders from his wife to remember to take his medication. *Id.* His wife takes him to doctors appointments as well because he has difficulty remembering the doctor's instructions. *Id.* Plaintiff ultimately stopped pursuing counseling and medication to treat his depression because they were not bringing him relief. (R. at 51.)

## B.     Vocational Expert Testimony

Richard P. Oestreich, Ph.D., testified as the vocational expert ("VE") at the administrative hearing. (R. at 53-55.) The ALJ proposed to the VE a series of hypothetical situations concerning Plaintiff's residual functional capacity. Specifically, the ALJ presented a hypothetical situation in which if Plaintiff was limited to lifting, carrying, pushing and pulling 20 pounds occasionally and 10 pounds frequently; he was able to sit, stand and walk for six hours each out of an eight-hour workday; and he was limited to occasional overhead reaching and occasional climbing of ladder, rope and scaffold. (R. at 53.) Also in this hypothetical situation Plaintiff retains the ability to understand, remember and carry out simple and some moderately complex tasks and instructions; and is able to maintain concentration and attention for two-hour segments over an eight-hour work period; responds appropriately to supervisors and coworkers

in a task oriented setting where contact with others is casual and infrequent; adapts to simple changes; and avoids hazards in a setting without strict production quotas.  (R. at 53-54.)  Based on this hypothetical situation, the VE stated that light, unskilled jobs would be available at the state and national levels that Plaintiff could perform, such as an inspector, an assembler, and a worker involved in light housekeeping.  (R. at 54.)  The VE indicated that, given the hypothetical restrictions, Plaintiff would not be able to perform his previous work as a heavy equipment operator.  *Id.*

The VE testified that if Plaintiff needed to take unscheduled breaks throughout the workday in order to lie down, he would be precluded from employment.  *Id.*  The VE further testified as to his belief that his testimony was consistent with the Dictionary of Occupational Titles ("DOT").  *Id.*

Upon cross examination, the VE acknowledged that Plaintiff would be unable to perform the jobs that the VE referenced in his earlier testimony if Plaintiff were required to miss up to three days per month from work due to doctor's appointments or symptoms from his medical condition.  (R. at 54-55.)

### III.   MEDICAL RECORDS

### A.   Physical Impairments

Plaintiff sustained a work-related injury in 1989 caused by lifting wooden pallets over his head.  (R. at 250.)  Plaintiff suffered displacement of 2 cervical discs.  *Id.*  As a result, Plaintiff underwent surgical fusion at C5, C6 and C7.  (R. at 244, 247, 324.)

1.    **Nancy Henceroth-Gatto, D.O.**

Dr. Gatto is Plaintiff's long-time family physician.  (R. at 727.)  The record contains treatment records from Dr. Gatto as far back as May 2004 through January 2011.

Dr. Gatto documented Plaintiff's complaints of neck and back pain and numbness in his arms throughout her treatment records.  *See*, *e.g.*, R. at 273, 274, 275, 278, 280, 282, 286, 411, 412.  Dr. Gatto recorded Plaintiff's complaints of pain beginning in 2004 through 2011.  *Id.*  For example, on March 27, 2001, Plaintiff reported that the "pain is unbearable."  (R. at 286.)  On December 23, 2008, Dr. Gatto documented that Plaintiff "still has pain in neck and between shoulder blades."  (R. at 412.)  On February 9, 2009, Dr. Gatto reported that Plaintiff is "still having pain and numbness."  (R. at 411.)   In February 2009, Dr. Gatto opined on a prescription slip that Plaintiff was "disabled and unable to work."  (R. at 395.)

In April 2009, Plaintiff underwent a lower extremity venous evaluation which showed no evidence of acuted deep venous thrombosis.  (R. at 516.)

In November 2010, during an appointment following ablation to his nerves in his back and neck, Plaintiff reported that the muscle spasms in his back had subsided.  (R. at 543.)

In January 2011, Plaintiff reported having "a lot of trouble with left shoulder since ablation."  (R. at 540.)  Dr. Gatto's clinical impression was Post-laminectomy syndrome in his cervical region.  (R. at 541.)  During that same visit Dr. Gatto noted "positive spurling - grip paresis left greater than right - gross decrease [range of motion] bilat shoulder - increased tone."  *Id.*

2.    **Christopher D. Cannell, M.D.**

Physical medicine and rehabilitation specialist, Dr. Cannell, saw Plaintiff on March 17, 2004 on referral from Dr. Gatto.  Dr. Gatto referred Plaintiff to evaluate the numbness in digits 4 and 5 of both hands over the muscles of the palm that control the motion of the little finger.  (R. at 244.)  Dr. Cannell reported that Plaintiff also "has a little bit of neck pain as well as no radicular pain."  *Id.*  On examination, Dr. Cannell reported that Plaintiff had normal two point discrimination in digits 4 and 5 of both hands, as well as intact pinprick and light touch.  *Id.*  Plaintiff's strength was normal in the hand intrinsics with no atrophy noted.  According to Dr. Cannell, "other than the disc protrusion on the left side at T1-2, [] his cervical spine looks good . . . . From C5 to C7 there is of course effusion, but his spinal cord looked fine and there is no recurrent disc herniation and no nerve root impingement in the cervical spine itself."  (R. at 244.)  Dr. Cannell opined that Plaintiff's numbness "may be residual numbness from his old cervical disc herniation back in 1989."  *Id.*  Dr. Cannell concluded by stating that "[m]ost likely, he'll just be left with numbness to some extent 24 hours a day in digit 4 and 5 of both hands.)  (R. at 245.)

On January 14, 2004, Dr. Cannell evaluated Plaintiff for upper limb numbness and tingling.  (R. at 265.)  Dr. Cannell reported that Plaintiff's "pain is under good control."  *Id.*  Dr. Cannell noted numbness and tingling that stays with Plaintiff 24 hours per day.  To more fully evaluate Plaintiff's condition, Dr. Cannell recommended an MRI of the cervical spine as well as an EMG and nerve conduction studies of both upper limbs.

On February 27, 2004, Plaintiff underwent an MRI of his cervical spine which showed status post cervical fusion from C5 through C7 with no recurrence of disc herniation at those levels.  (R. at 261.)  The MRI also showed posterior lateral left Tl-T2 disc protrusion, and multi

level degenerative disc disease throughout the spine.  The MRI revealed no nerve root

impingement.  (R. at 261-62.)

Dr. Cannell examined Plaintiff again on July 17, 2007.  Plaintiff reported that he

continued to suffer from upper back pain and upper limb numbness since his surgery following a

1989 work injury.  (R. at 241.)  Plaintiff reported that his neck pain was progressively

worsening.  Upon examination, Dr. Cannell noted appropriate effect, normal gait, and normal

upper and lower limb strength.  A sensory exam was diminished to pin prick and light touch in

digits four and five of both hands, over the hypothenar eminence, and over the ulnar aspect of

both arms.  Plaintiff's upper limb strength and tone was normal.  Dr. Cannell noted that

Plaintiff's cervical range of motion was very limited to approximately 40 degrees of left and

right-sided rotation, 40 degrees of flexion, and 30 degrees of extension limited by neck pain.  Dr.

Cannell noted his impression as chronic cervical myofascial pain syndrome, as well as status

post cervical discectomy and fusion from C5 through C7 with persistent upper limb numbness.

Dr. Cannell also noted no evidence of recurrent cervical disc herniation, and no significant

change in MRI scan compared to previous study in 2004.  He noted that Plaintiff's upper limb

numbness was unchanged overall since his prior exam in 2004 and he recommended cervical

facet and trigger point injections at C5 through C7.  (R. at  243-43.)

Plaintiff saw Dr. Cannell again on October 8, 2008.  (R. at 356-58.)  Dr. Cannell's

examination revealed no weakness or atrophy in Plaintiff's upper limbs, although there was

some give away weakness more proximally.  Plaintiff was unable to elevate his shoulders for

forward flexion and abduction beyond approximately 120 degrees because of pain inhibition.

Dr. Cannell noted that Plaintiff's cervical range of motion was limited by at least 50 percent in

all directions.  Plaintiff was very tender to light palpation over the cervical and upper thoracic

region, rhomboids, levator scapulae musculature and trapezius muscle.  Dr. Cannell diagnosed

chronic cervical and shoulder girdle;  thoracic myofascial pain syndrome; and status post

cervical discectomy and fusion from C5 through C7 with persistent upper limb numbness.  Dr.

Cannell believed that Plaintiff "has certainly been through all reasonable conservative

management."  Dr. Cannell also noted that "[i]t is almost strange that he has this extreme

hypersensitivity, almost dysesthesia in his upper back and neck region to just very light

palpation."  Dr. Cannell recommended radio frequency neurotomy in the cervical region.  (R. at

357-58.)

Plaintiff underwent a nerve conduction study on January 7, 2009 which showed no

evidence of carpal tunnel syndrome on either side, ulnar neuropathy, plexus disorder or cervical

radiculopathy.  (R. at 353-55.)

### 3.      Robert J. Masone, M.D.

On August 13, 2007, Plaintiff visited Dr. Masone with complaints of pain along his neck

and into his right shoulder blade.  (R. at 250.)  Upon physical examination, Dr. Masone noted

that Plaintiff "has poor cervical range of motion in all 3 planes."  He also noted disproportion in

sensitivity to light touch along the cervical spine and right scapular medial area.  Dr. Masone

noted his impression as cervical disc herniation and cervical strain/sprain.  Dr. Masone planned

to proceed with cervical injections in an attempt to reduce Plaintiff's pain.

On August 30, 2007, Dr. Masone noted Plaintiff "has very decreased range of motion in

his neck."  (R. at 247.)  After pain blocking injections to his cervical area, he achieved greater

than 70% relief.  Dr. Masone noted that Plaintiff had diagnostic facet injections ten days earlier

and got 60% relief for three days.  Dr. Masone's impression was that Plaintiff "had an injury at work that led to displacement of 2 cervical disks; He had fusion of C5, C6, and C7.  He now has worsening neck pain and some radiating arm pain after that surgery despite all conservative care.  This is consistent with a postlaminectomy pain syndrome of the cervical spine." *Id.*  Dr. Masone opined that "[i]n my medical opinion and with a reasonable degree of certainty, he has a post cervical laminectomy pain syndrome." *Id.*

March 19, April 2, and April 15, 2009 Dr. Masone administered cervical epidural steroid injections to Plaintiff.  (R. at 495-97.)  Thereafter, Dr. Masone examined Plaintiff on May 18, 2009.  (R. at 494.)  Plaintiff complained of cervical and mid-thoracic pain between the shoulder blades.  Upon examination Dr. Masone noted poor cervical range of motion in all three planes.  Plaintiff reported that the injections made it feel like "someone took the knife out of my back." *Id.*  Plaintiff reported that about a week after the injections the pain returned.  Dr. Masone recommended repeating a course of physical therapy.  Plaintiff, however, was against the idea because physical therapy had caused his pain to worsen in the past.  Dr. Masone recommended massages across the upper back.  Although Plaintiff expressed apprehension for fear it would cause his pain to worsen, Plaintiff agreed to try massages.  *Id.*

Plaintiff visited Dr. Masone in October and November 2009 with severe cervical pain that radiated throughout the bilateral upper extremities, as well as increased pain through his neck and upper extremities when he engaged in increased physical activity, and lower back pain.  (R. at 501.)  Dr. Masone continued the diagnosis of cervical post-laminectomy pain syndrome and referred Plaintiff for a course of physical therapy.  Dr. Masone also noted multiple small

open wounds on Plaintiff's bilateral upper extremities.  Plaintiff reported that these sores were from picking at his own skin.

December 18, 2009, Dr. Masone noted that Plaintiff was failing to improve with conservative therapy, inlcuding time, medication management, TENS unit therapy, traction therapy, physical therapy, and injection therapy.  (R. at 501.)  Dr. Masone's treatment plan included a trial for a spinal cord stimulator for his cervical spine.

On February 2, 2010, Dr. Masone noted that Plaintiff had decreased cervical range of motion due to pain.  (R. at 529.)  He further noted that Plaintiff had been cleared by a psychologist for spinal cord stimulator trial.  Dr. Masone continued his impression of postlaminectomy pain syndrome.

April 7, 2010, Dr. Masone surgically placed two spinal cord stimulator trial leads and programmed the spinal cord stimulator system.  (R. at 527.)  Dr. Masone planned to complete a seven-day trial to determine if this technology helped Plaintiff with his pain and functioning.

Plaintiff followed-up with Dr. Masone on April 14, 2010 for evaluation of the one-week spinal cord stimulator trial.  (R. at 526.)  Dr. Masone noted that Plaintiff "seems supersensitive to the electrical energy stimulation.  Normally, there is a gap between the threshold where the perception of the stimulation occurs and where it gets uncomfortable and somewhere in that gap is a pleasant therapeutic stimulation.  That gap is so narrow we went right from perception to unpleasant stimulation.  We see this once in a while and it is unfortunate.  It did not help him at all." *Id.*

In May 2010, Dr. Masone noted that Plaintiff "has very tight and very tender cervical paraspinal muscles and upper trapezius muscles especially on the right."  (R. at 524.)  He further

noted that Plaintiff received no benefit from the spinal cord stimulator trial.  Dr. Masone planned to prescribe Neurontin for relief of Plaintiff's pain.

In June 2010, Dr. Masone examined Plaintiff and continued the diagnosis of postlaminectomy pain syndrome of cervical spine.  (R. at 523.)  He noted that Plaintiff is "very tender to palpation on cervical paraspinal muscles and upper trapezius muscles."  *Id.*  Dr. Masone also examined Plaintiff's lumbar spine which revealed antalgic gait.  He noted that Plaintiff has "much trouble transitioning from sitting to standing."  *Id.*  Dr. Masone planned C-9 diagnostic medical branch blocks at C5, C6, and C7.

Dr. Masone examined Plaintiff in July 2010.  (R. at 521.)  Plaintiff complained of cervical pain, thoracic pain, bilateral arm pain, and bilateral lower extremity pain.  Plaintiff stated that his pain was worse in the thoracic region with stabbing pain in his back.  Plaintiff reported having gone to the emergency room due to pain on June 25, 2010 where he received a shot of Dilaudid and a CT scan.  Dr. Masone reviewed the CT scan which showed no acute abnormalities.  Dr. Masone noted that Plaintiff is "exquisitely tender to palpatation of the cervical paraspinal muscles especially on the right and upper trapezius muscles bilaterally."  *Id.*

Plaintiff again presented to Dr. Masone on December 16, 2010 with complaints of horrible pain since his last radiofrequency ablation.  (R. at 537.)  Plaintiff reported that he has not been taking his Neurontin since the beginning of November due to a mixup at the pharmacy.  Dr. Masone found Plaintiff had an increase in pain before and after his most recent injection therapy secondary to noncompliance with his oral medication.

January 13, 2011, Plaintiff again presented to Dr. Masone with complaints of cervical pain, left shoulder pain, bilateral arm pain, and bilateral lower extremity pain.  (R. at 536.)  On

examination, Dr. Masone noted that hyperextension and rotation was causing an increase in pain. Plaintiff had decreased range of motion in all planes.  He remained extremely tender with palpation to cervical paraspinal muscles and upper trapezius muscles.  Dr. Masone administered Pennsaid samples.  (R. at 536.)

### 4.     Stephen T. Woods, M.D.

Dr. Woods examined Plaintiff on October 17, 2008 at the request of Dr. Cannell to explore more aggressive treatment options regarding his persistent neck and upper limb pain. (R. at 320-23.)  Upon examination, Plaintiff had no signs or symptoms of myelopathy, had a normal gait and maintained an upright posture.  Dr. Woods felt that Plaintiff was not a candidate for radio frequency neurotomy procedures and recommended electrodiagnostic testing with Dr. Cannell.

### 5.     Diane Manos, M.D./Leigh Thomas, M.D.

In March 2009, state agency physician, Dr. Manos, reviewed the record and assessed Plaintiff's physical functioning capacity.  (R. at 359-66.)  Dr. Manos opined that Plaintiff could lift and carry twenty pounds occasionally and ten pounds frequently; stand and/or walk about six hours in a workday; sit for about six hours in a workday; engage in limited pushing and pulling with upper extremities; and could only occasionally climb ladders, ropes or scaffolds.  (R. at 360-61.)  Dr. Manos further found that Plaintiff would be limited in reaching in all directions, including overhead due to cervical spine symptoms and upper extremity pain.  (R. at 362.)  Dr. Manos observed that Plaintiff was only partially credible regarding his complaints of arm and neck pain.  (R. at 364.)  Dr. Manos emphasized that although the evidence demonstrated that Plaintiff suffers from pain, the record did not indicate that the pain was as restrictive as Plaintiff

claimed. *Id.* In September 2009, state agency physician, Dr. Thomas, affirmed Dr. Manos' assessment. (R. at 463.)

### 6. Fairfield Medical Center

Plaintiff presented to the emergency room in June 2010 with increased back pain between his shoulder blades. A CT scan of the thoracic spine evidenced no acute abnormality, including no fracture. Upon examination, the examining physician noted that Plaintiff was in no acute distress; he ambulated without difficulty; his upper back and thoracic showed mild to moderate tenderness; he had no motor deficit or sensory deficit; and he was able to dorsiflex ankle and plantar flex with good strength. The physician was unable to locate a "trigger" point for Plaintiff's pain, and found no evidence of lower extremity weakness. The physician noted mild to moderate thoracic paravertebral spasm on both sides of the upper back. There were no specific sensory findings; reflexes were approximately 2+ symmetrical including the knee and the Achilles; and there was no significant kyphosis, scoliosis, or other deformity. Plaintiff was given an injection of hydromorphine and upon improvement was discharged. (R. at 530-35.)

Dr. Robert Darwin interpreted the CT scan administered during Plaintiff's hospital visit. (R. at 535.) Dr. Darwin noted that "[t]here is no acute fracture or dislocation. There is mild diffuse degenerative disc disease with mild disc space narrowing and osteophyte formation. *Id.*

### B. Mental Impairment

### 1. Charles Loomis, M.A.

13

On October 15, 2008, Mr. Loomis examined Plaintiff on behalf of the state agency.  (R. at 313-18.)  Plaintiff presented with a flat affect and a subdued mood with periodic tearfulness.  He reported a poor appetite and commented that his sleep was often interrupted.  He expressed little hope for the future and indicated a low sense of self worth.  Plaintiff also reported some thoughts of suicide but denied any plans or attempts.  He also reported feelings of fatigue and low energy.  He appeared tense and distracted.

Mr. Loomis noted that Plaintiff's concentration and attention to task, immediate and delayed memory functions, and computational abilities were below average.  (R. at 316.)  Plaintiff indicated a modest fund of general information, reasoning and practical problem solving abilities.  Mr. Loomis estimated Plaintiff's functional intelligence to be in the low to average range.

Plaintiff reported no daily routine and commented that he performs no household or outside chores.  He reports that he does not "do much" visiting with family, friends or neighbors.  (R. at 316-17.)   He watches television.  When asked why he was unable to work he indicated it was because of the pain in his neck, back and arms.

Mr. Loomis assigned Plaintiff Global Assessment of  Functioning ("GAF") score of 55.[1]  Mr. Loomis opined that Plaintiff's ability to relate to others, including fellow workers,

---

[1]The GAF scale is used to report a clinician's judgment of an individual's overall level of functioning. Clinicians select a specific GAF score within the ten-point range by evaluating whether the individual is functioning at the higher or lower end of the range. *See* American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 33–34 (American Psychiatric Association, 4th ed. text rev. 2000) (DSM-IV-TR). A GAF score of 51-60 is indicative of an individual having "moderate symptoms ... or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV-TR at 34.

supervisors and the general public did not appear to be impaired, as he reported that he got along with his neighbors as well as people he encounters when he goes to the store, and that he got along acceptably with coworkers and supervisors when he was employed. He further noted that Plaintiff's ability to understand, remember and follow moderately complex instructions did not appear to be impaired and that he possessed adequate ability to understand, remember and follow moderately complex directions. Mr. Loomis determined that Plaintiff's ability to maintain attention and concentration appeared to be mildly impaired as he did at times appear distracted and seemed to have some difficulty maintaining task focus. Plaintiff's ability to cope to the ordinary stresses and pressures of competitive work appeared to Mr. Loomis to be moderately impaired based upon his symptoms of anxiety and depression when coupled with his perception of his physical limitations. (R. at 317-18.)

### 2. __Karen Terry, Ph.D.__

In November 2008, state agency psychologist Dr. Terry examined Plaintiff's medical records and assessed his mental condition. (R. at 333–50.) Dr. Terry concluded that Plaintiff had mild restrictions of activities of daily living and in maintaining social functioning, as well as moderate difficulties maintaining concentration, persistence or pace. Dr. Terry further found that Plaintiff had no episodes of decompensation. (R. at 347.)

### 3. __Genesis Health Care System__

In March 2009 Plaintiff was hospitalized for three days for suicidal ideations. (R. at 382-92.) Medical staff noted that Plaintiff was alert and oriented. His speech was coherent and goal directed. Medical staff further noted that Plaintiff's mood was depressed and his affect was blunted. Plaintiff reported suicidal ideations, but denied intent or plan. His memory was intact,

15

but his insight and judgment were poor.  Medical staff gave Plaintiff Prozac and noted that he

was compliant with medication and treatment.  Once he reached maximum benefits from

inpatient hospitalization, medical staff discharged Plaintiff with instructions to follow up with

Six County.  (R. at 384.)  Upon discharge, Plaintiff was diagnosed with "Major depression,

recurrent, severe."  (R. at 369.)

### 4. Six County, Inc./Morgan Counseling Center

Plaintiff followed up with Six County in April 2009.  (R. at  427-38.)  He reported

depression and thoughts of suicide on a regular basis.  Staff noted that Plaintiff's affect was

subdued, but within a normal range.  Speech was normal.  Plaintiff was diagnosed with major

depressive disorder, recurrent, severe without psychotic features.  Staff discussed therapeutic

interventions with Plaintiff to aide in alleviation of depressive symptoms and improve coping

skills.

### 5. Cynthia Waggoner, Psy.D.

In August 2009, state agency psychologist, Dr. Waggoner, reviewed the file and

determined that it contained insufficient information because Plaintiff had not returned the

activities of daily living questionnaire.  (R. at 449-62.)  She also noted the presence of "major

depressive disorder, recurrent, severe w/o psychotic feat[ures]."  (R. at 452.)  She did indicate

that there were no episodes of decompensation.

### 6. Leslie Rudy, Ph.D.

In October 2009, Dr. Rudy, a state agency psychologist, reviewed Plaintiff's file.  (R. at

464-81.)  Dr. Rudy found Plaintiff had mild restriction of activities of daily living; moderate

difficulties in maintaining social functioning and in maintaining concentration, persistence or

pace; and no episodes of decompensation.  Dr. Rudy also found that the evidence did not

establish the presence of the "Part C" criteria.  (R. at 479.)  In the narrative assessment of

Plaintiff's ability to engage in work-related activities from a mental standpoint, Dr. Rudy

concluded that Plaintiff's allegations are credible.  Dr. Rudy opined that Plaintiff is able to

perform work-related tasks in a relatively static work environment that only has superficial

interactions.

## IV.  THE ADMINISTRATIVE DECISION

On April 13, 2011, the ALJ issued his decision.  (R. at 19-32.)  At step one of the

sequential evaluation process,[2] the ALJ found that Plaintiff had not engaged in substantially

gainful activity since June 17, 2007.  (R. at 21.)  At the second step, the ALJ found that Plaintiff

had the severe impairments "best described" as a back condition; a neck condition; a leg

condition; and depression.  *Id.*  The AJL determined that Plaintiff's conditions involving his

---

[2] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence.  *See* 20 C.F.R. §416.920(a)(4).  Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1.  Is the claimant engaged in substantial gainful activity?
2.  Does the claimant suffer from one or more severe impairments?
3.  Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4.  Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5.  Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

hands, heart, and right eye, as well as a blood clot condition, did not constitute severe medical

impairments because they do not cause more than minimal functional limitations.  *Id.*  At step

four, the ALJ determined that Plaintiff did not have an impairment or combination of

impairments that met or medically equaled one of the listed impairments described in 20 C.F.R.

Part 404, Subpart P, Appendix 1.  (R. at 22.)  At step four of the sequential process, the ALJ

evaluated Plaintiff's residual functional capacity ("RFC").  The ALJ found as follows:

> After careful consideration of the entire record, the undersigned finds that the
> claimant has the residual functional capacity to lift, carry, push, and pull 20
> pounds occasionally and 10 pounds frequently.  He is able to sit, stand, and walk
> for 6 hours each in an 8-hour workday.  He is limited to occasional overhead
> reaching and occasional climbing of ladders, ropes, and scaffolds.  Mentally, the
> claimant retains the ability to understand, remember, and carry out simple and
> some moderately complex tasks and instructions.  He is able to maintain
> concentration and attention for 2 hour segments over an 8-hour work period and
> is able to respond appropriately to supervisors and coworkers in a task-oriented
> setting where contact with others is casual and infrequent.  He is further
> able to adapt to simple changes and avoid hazards in a setting without strict
> production quotas.

(R. at 25.)  In reaching this determination, the ALJ adopted the opinions of Drs. Manos, Leigh

and Rudy because he found them to be well-qualified by reason of training and experience in

reviewing an objective record and formulating an opinion as to limitations.  *Id.*  The ALJ also

found the assessments of these three physicians consistent with the totality of the medical

evidence of record.  *Id.*  The ALJ also afforded great weight to the psychological opinion of

consultative examiner, Charles Loomis.  (R. at 26.)  According to the ALJ, Mr. Loomis' opinion

was generally consistent with and well supported by the totality of the evidence and an accurate

representation of Plaintiff's mental residual functional capacity status.  *Id.*  The ALJ concluded

that the objective evidence fails to document the presence of any impairment or combination of

impairments that could reasonably be expected to result in pain or other symptoms of such a severity or frequency as to preclude the range of work described above.  (R. at 29.)

Relying on the VE's testimony, the ALJ determined that jobs exist in significant numbers in the state and national economy that Plaintiff can perform.  (R. at 30-32.)  He thus concluded that Plaintiff was not disabled within the meaning of the Social Security Act.  (R. at 32.)

## V.  STANDARD OF REVIEW

Upon review of a case appealing the decision of the Commissioner, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Services*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial.  The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision.  *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).  Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v.*

*Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VI.  LEGAL ANALYSIS

In his Statement of Errors, Plaintiff argues that the ALJ committed three errors: (1) he failed to properly evaluate Plaintiff's credibility; (2) he assigned improper weight to a non-examining source; and (3) he failed to have a medical expert at the hearing available to testify as to the medical record.  (ECF No. 11.)  The Undersigned agrees with Plaintiff's first assignment of error and finds that the ALJ failed to properly evaluate Plaintiff's credibility. Thus, analysis as to Plaintiff's second and third assignments of error is unnecessary.

The Undersigned concludes that the ALJ failed to properly evaluate Plaintiff's credibility.  "The ALJ's assessment of credibility is entitled to great weight and deference, since he had the opportunity to observe the witness's demeanor."  *Infantado v. Astrue*, 263 F. App'x 469, 475 (6th Cir. 2008) (citing *Walters v.  Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997)); *Sullenger v. Comm'r of Soc. Sec.*, 255 F. App'x 988, 995 (6th Cir. 2007) (declining to disturb the ALJ's credibility determination, stating that: "[w]e will not try the case anew, resolve conflicts in the evidence, or decide questions of credibility" (citation omitted)).

Despite the deference courts generally afford to an ALJ's credibility determination, "an

ALJ's assessment of a claimant's credibility must be supported by substantial evidence."
*Walters*, 127 F.3d at 531.  "Discounting credibility to a certain degree is appropriate where an
ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence."
*Id.*  Furthermore, in assessing credibility, the ALJ may consider a variety of factors including
"the . . . frequency, and intensity of the symptoms; . . . [and] the type, dosage, effectiveness, and
side effects of any medication taken to alleviate the symptoms . . . ."  *Rogers*, 486 F.3d at 247.

 In making a credibility determination, the ALJ "must consider the record as a whole,
including objective medical evidence; the claimant's statements about symptoms; any statements
or other information provided by treating or examining physicians and other persons about the
conditions and how they affect the claimant; and any other relevant evidence."  *Reynolds v.
Comm'r of Soc. Sec.*, 424 Fed. App'x 411, 417 (6th Cir. 2011) (citing SSR 96-7p, 1996 WL
374186, at *2 (Jul. 2, 1996)); *see also Rogers*, 486 F.3d at 247 (acknowledging that credibility
must be "based on a consideration of the entire record") (internal quotation omitted).  An ALJ's
credibility determination is not supported by substantial evidence if he or she fails to consider
the record as a whole.  *See*, *e.g.*, *Martin v. Comm'r Soc. Sec.*, No. 2-cv-71787, 2011 WL
23784469, *1 (E.D. Mich. Sept. 29, 2003) (concluding ALJ's credibility determination was not
supported by substantial evidence where he failed to consider medical records that included
medical diagnoses of fibromyalgia); *Howard v. Comm'r of Soc. Sec.,* 276 F.3d 235, 242 (6th Cir.
2002) (concluding that ALJ credibility determination was not supported by substantial evidence
where the "ALJ disregarded [a] significant portion of the record").

 Here, the ALJ concluded that Plaintiff's representations concerning the severity of his
pain lacked credibility.  The ALJ stated that although "[t]he claimant appears to have underlying

21

medically determinable impairments that could reasonably cause some symptomatology. . . . a

careful review of the record does not document sufficient objective evidence to substantiate the

severity of the pain and symptoms and degree of functional limitations alleged by the claimant."

(R. at 26.)  The ALJ then presented an overview of Plaintiff's medical records, emphasizing

those in which the examining physician was unable to determine a cause for Plaintiff's pain.  (R.

at 27-28.)  The ALJ offered additional reasons for discounting Plaintiff's credibility:

> In addition to the general lack of objective evidence to support his subjective
> complaints, there are other considerations that weigh against the claimant's overall
> credibility.  For example, the claimant reported to his doctor on August 13, 2007 that
> he had [] been laid off three (3) weeks ago, but he testified at the hearing that he was
> laid off in December 2007 due to the season.  While the reports by the claimant of
> his lay off are inconsistent, the layoff itself tends to demonstrate to the undersigned
> that the claimant did *not* stop working due to his alleged impairments.  Additionally,
> the claimant testified that subsequent to his layoff he collected unemployment.
> Further, the claimant has been non-compliant with treatment – for example, he
> testified that he stopped going to counseling, although he continues to complain of
> depression; on May 18, 2009, the claimant was against the suggestion of repeating
> a course of physical therapy to address his pain (Ex 21F/2); and, on December 16,
> 2010 he refused a suggestion for follow up with is treating physician related to
> complaints of symptoms of anxiety because he was "not interested in taking any
> other medications" (Ex 25F/3).
>
> The claimant's daily activities are not restricted to the extent that he would be
> precluded from the range of work assessed herein as the claimant, on April 13, 2009,
> denied that his activities of daily living were limited (See Ex 14F/7).
>
> The record also contains inconsistent and exaggerated statements that further detract
> from the claimant's overall credibility.  For example, the claimant testified that he
> resided with his aging mother but adamantly denied providing any care for her;
> however, he reported to staff at Six County on May 19, 2009 that he had told his
> mother he would care for [her] until she died (Ex 14F/14).  Additionally, the
> claimant testified that he rarely spent time with his family, including his children or
> grandchildren; however counseling progress notes dated August 18, 2009 evidence
> that claimant reported he was spending a lot of time with his grandchildren (Ex
> 19F/3).  Further, as set forth above, the claimant testified at the hearing that his pain
> level was at a 6 or 7 (on a scale of 1 to 10 with 10 being pain that should require
> hospitalization) and that he has days where his pain is "off the charts" at an 11 or 12;
> however, the objective medical evidence does not support such "off the charts"

reports of pain.  Rather, the record demonstrates that the claimant reported pain, for example, at 5/10, an 81/2 or 9, or "sometimes" a 10 (Ex 3F, 26, 29 and 24F/4), and he did not report any such "off the charts pain" in his pain questionnaire submitted on October 2, 2008 (Ex 5E/2).

Although inconsistent/exaggerated information provided by the claimant may not be the result of a conscious intention to mislead, nevertheless, such statements suggest that the information provided by the claimant generally may not be entirely reliable.

(R. at 29.)

The Undersigned concludes that the ALJ erred in several ways in assessing Plaintiff's credibility.  First, in considering the objective medical evidence to assess the severity of Plaintiff's pain, the ALJ failed to consider a significant portion of the record.  For example, the ALJ failed to consider the numerous medical reports relating to Plaintiff's treatment with Dr. Masone.  (R. at 27-28.)  Plaintiff saw Dr. Masone for pain from 2007 through 2011.  (R. at 247-251, 493-501, 517-529.)  Dr. Masone diagnosed Plaintiff with post cervical laminectomy pain syndrome.  *See* R. at 247 ("In my medical opinion and with reasonable degree of certainty, [patient] has post cervical laminectomy pain syndrome.").  Dr. Masone also repeatedly noted the severity of Plaintiff's pain over the course of several years.  *See*, *e.g.*, R. at 494 (noting poor cervical range of motion in all three planes); 529 (noting poor cervical range of motion due to pain); 524 ("[patient] has very tight and very tender cervical paraspinal muscles and upper trapezius muscles especially on the right."); 523 ("[pateint] is very tender to palpation on cervical paraspinal muscles and upper trapezius muscles . . . [patient] has much trouble transitioning from sitting to standing."); 521 ("[patient] is exquisitely tender to palpation of the cervical paraspinal muscles especially on the right and upper trapezius muscles bilaterally."); 536 (noting that hyperextension of the spine causes increase in pain as well as rotation).

Despite Dr. Masone's numerous and repeated observations concerning Plaintiff's pain,

23

there is no indication in the ALJ's RFC assessment that he considered any of Dr. Masone's medical reports.  Nor did he consider Dr. Masone's diagnosis of post cervical laminectomy pain syndrome.  In fact, the diagnosis is not once mentioned in the ALJ's entire report.  The ALJ thus failed to "consider the record as a whole, including objective medical evidence," in assessing Plaintiff's credibility.  *Reynolds*, 424 Fed. App'x at 411.

The ALJ likewise failed to consider impressions from both Dr. Gatto and Dr. Cannell regarding Plaintiff's diagnosis of a pain disorder.  Dr. Gatto noted her impression that Plaintiff suffered from post laminectomy pain syndrome.  (R. at 541.)  Dr. Cannell opined on two separate occasions that Plaintiff suffers from myofascial pain syndrome.  (R. at 242, 356.)  The ALJ failed to consider both of these doctors' impressions that Plaintiff suffers from a pain syndrome.  The ALJ's disregard of a significant portion of the record leads the Undersigned to conclude that his credibility assessment is not supported by substantial evidence.  *Howard,* 276 F.3d at 242.

Nor are the "other considerations" upon which the ALJ relies in his credibility assessment supported by substantial evidence.  Although it is true that Plaintiff's hearing testimony concerning the date he stopped working conflicts with other evidence, Plaintiff repeatedly informed the ALJ that he has difficulty remembering dates.  (R. at 43-44.)

The ALJ's determination that Plaintiff has been noncompliant with treatment is also not supported by substantial evidence.   Although a failure to follow a treatment plan may undermine a claimant's credibility, the "ALJ must first explore the claimant's reasons for the lack of medical care before drawing a negative inference."  *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012) (citing SSR 96-7p, 1996 WL 374186, at *7).  Generally a claimant must follow a recommended treatment plan, "or have a good reason for failing to do so."  *Smith-Marker v.*

*Astrue*, 839 F. Supp. 2d 974, 984 (S.D. Ohio 2012) (citing 20 C.F.R. § 404.1530).  A "good

reason" may include an inability to afford treatment, ineffectiveness of further treatment, or

intolerable side effects.  *Shauger*, 675 F.3d at 696.  Here, Plaintiff discontinued counseling and

medication for depression for a "good reason," namely because they were not bringing him

relief.  (R. at 51.)  Plaintiff also was against another round of physical therapy because the prior

course of treatment caused his pain to worsen.  (R. at 494.)  This, too, constitutes "good reason"

to resists that form of treatment.[3]   Plaintiff also expressed reluctance to see a physician for

potential obsessive compulsive behavior because he did not want to be required to take

additional medications due to their side effects.  (R. at 538.)  Aside from these isolated incidents,

Plaintiff has been compliant, indeed vigilant in pursuing his treatment recommendations.  In fact,

he has undergone numerous procedures, including medication management, TENS unit therapy,

traction therapy, physical therapy, injection therapy, a spinal cord stimulator, and  radio

frequency ablation.  (R. at 501, 47.)

 Nor does substantial evidence support the ALJ's discounting of Plaintiff's credibility

based on the report from Six County.  The report in question states as follows: "Limitations of

Activities of daily living: Denies."   (R. at 428.)  There is no further information or elaboration

as to the meaning of this entry or the circumstances under which it was made.  Moreover, Six

County personnel conducted this assessment following Plaintiff's hospitalization for suicidal

ideation.  One ambiguous line in a single report indicating that Plaintiff, while likely still under

distress, may have denied limitations of his activities cannot serve as substantial evidence to

---

[3] Notably, Plaintiff agreed to try massages instead of more physical therapy, even though
he feared that massages would cause his pain to worsen as well.  *Id.*

25

discount his credibility.  *See*, *e.g.*, *Crabtree v. Astrue*, No. 3:09-cv-320, 2010 WL 3009592, at *8 (E.D. Tenn. Jul 1, 2010) (rejecting the ALJ's credibility determination where it was based on an ambiguous note contained in the medical reports that suggested the plaintiff may not have been compliant with her doctor's recommendation that she exercise); *Nelms v. Astrue*, No. 1:09-cv-236, 2010 WL 3219123, at *8 (E.D. Tenn. Apr. 23, 2010) (concluding that an ambiguous line contained in a medical report could not serve as substantial evidence to support the ALJ's credibility determination).

The same is true with respect to Plaintiff's statements concerning his mother.  Plaintiff testified that although he lived with his mother he did not provide her care.  (R. at 45.)  The ALJ suggests that this statement conflicts with a counseling note in which Plaintiff expressed sorrow over the thought of having to put his mother in a nursing home: "[Patient r]eports feelings of guilt about her going to a nursing home b/c he told her he would take care of her until she died." (R. at 439.)  The Undersigned finds no conflict in the evidence.  The record contains no indication when Plaintiff purportedly told his mother he would care for her until she died.  Nor does the counseling note indicate that Plaintiff had been caring for her up to that point.  The record reflects nothing more than Plaintiff's sorrow at the thought of sending his mother to a nursing home, which is supported by additional records.  *See* R. at 487 ("[Patient r]eports he worries that he will not be w/ [his mother] when she dies if she is in a nursing home.").

Nor does the Undersigned find substantial support for the ALJ's discounting of Plaintiff's credibility based on conflicting reports as to the amount of time he spends with his grandchildren.  A counseling report indicates that in 2009 Plaintiff reported spending a lot of time with his grandchildren to help cope with stress at home, including the stress associated with

sending his mother to a nursing home.  (R. at 484.)  In 2011, when the ALJ asked Plaintiff, "do you see your kids or your grand kids," Plaintiff responded, "Not very often."  (R. at 52.)  The discrepancy here is minor, at best, and relates to questions posed nearly two years apart.  Simply put, this cannot serve as substantial evidence for the ALJ to discount Plaintiff's credibility.

The ALJ's next attempt to discount Plaintiff's credibility is likewise unavailing.  The ALJ states that Plaintiff reported feeling pain that at times surpassed a level ten on a ten-point-scale.  (R. at 29.)  According to the ALJ, Plaintiff "did not report any such 'off the charts pain' in his pain questionnaire submitted on October 2, 2008."  *Id.*  The Undersigned's independent review of the record demonstrates the ALJ's statement to be incorrect.  (R. at 172.)  In response to the question on the October 2nd questionnaire that asked: "How long does this symptom last?", Plaintiff responded, "Every day - Constant 8-10+."  *Id.*  In response to the question: "How often do you have this symptom?", Plaintiff responded, "Every hour - Every day - Constant pain 8-10+."  *Id.*  Thus Plaintiff did report "off the charts pain" on his October 2, 2008 questionnaire.


Although the final reason upon which the ALJ relied could potentially detract from a claimant's credibility, the Undersigned concludes that it does not constitute substantial evidence in this case.  As the ALJ points out, Plaintiff stopped working because he was laid off.  (R. at 29.)  Generally the fact that something other than the claimant's impairment caused him or her to stop working may affect the ALJ's analysis.  *See*, *e.g.*, *Morgan v. Astrue*, No. 2:08cv-1108, 2010 WL 547489, *3 (S.D. Ohio Feb. 11, 2010) (recognizing that a plaintiff's decision to stop working for a reason other than alleged disability may affect the ALJ's analysis).  Given that this is the sole criterion that may appropriately detract from Plaintiff's credibility, however, the

27

Undersigned finds a lack of "substantial evidence" to support the ALJ's credibility determination. This is especially true because Plaintiff, although otherwise entitled to unemployment benefits, *voluntarily* terminated his unemployment benefits because "[he] didn't feel that [he] deserved unemployment because [he] wasn't able to work." (R. at 43.) Plaintiff's voluntary decision to terminate his unemployment benefits tends to support his credibility.

Accordingly, the Undersigned concludes that the ALJ's credibility assessment is not supported by substantial evidence. The ALJ failed to consider a substantial portion of the record in assessing whether objective evidence supports Plaintiff's subjective complaints of pain. The minor discrepancies upon which the ALJ relies are of little probative value in assessing Plaintiff's credibility. In light of this conclusion, the Undersigned finds it unnecessary to address the other issues Plaintiff raises in his Statement of Errors.

## VII.  CONCLUSION

Due to the errors outlined above, Plaintiff is entitled to an order remanding this case to the Social Security Administration pursuant to Sentence Four of 42 U.S.C. § 405(g). Accordingly, the undersigned **RECOMMENDS** that the Court **REVERSE** the Commissioner of Social Security's non-disability finding and **REMAND** this case to the Commissioner and the ALJ under Sentence Four of § 405(g) for further consideration consistent with this Report and Recommendation.

## VIII.  PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in

question, as well as the basis for objection.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).

Response to objections must be filed within fourteen (14) days after being served with a copy.

Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and

Recommendation will result in a waiver of the right to *de novo* review by the District Judge and

waiver of the right to appeal the judgment of the District Court. *See, e.g.*, *Pfahler v. Nat'l Latex

Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate

judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district

court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that

defendant waived appeal of district court's denial of pretrial motion by failing to timely object to

magistrate judge's report and recommendation). Even when timely objections are filed, appellate

review of issues not raised in those objections is waived. *Robert v. Tesson*, 507 F.3d 981, 994

(6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the

issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).


Date: February 11, 2013         ___/s/ *Elizabeth A. Preston Deavers*___
                   Elizabeth A. Preston Deavers
                   United States Magistrate Judge